IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2021

## IN RE SYLVIA H.

**Appeal from the Juvenile Court for Claiborne County**
**No. 2018JV2225        Robert M. Estep, Judge**

_____

### No. E2020-01009-COA-R3-PT

_____

A father challenges the trial court's decision terminating his parental rights on the grounds of abandonment by wanton disregard and failure to manifest an ability and willingness to personally assume custody or financial responsibility. He further asserts that the trial court erred in finding that termination of his rights is in the child's best interest. After reviewing the record on appeal, we have concluded that clear and convincing evidence supports the trial court's decision in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Jordan Chandler Long, Knoxville, Tennessee, for the appellant, Jamarcus D.

Herbert H. Slatery, III, Attorney General and Reporter, and Mary Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Jamarcus D. ("Father") is the biological father of Sylvia H., a child born in April 2011. Sylvia was removed from the custody of her mother, Teresa H. ("Mother"), in June 2018 after Mother left the child unattended when Mother was caught shoplifting in a Walmart store. The police apprehended Mother and learned that she and three of her children, including Sylvia, had been living in a car for several days. In May 2018, Mother and the children had left Ohio, where they had been living with their maternal grandfather. At the time of Mother's arrest, Father was incarcerated in Ohio. Sylvia was adjudicated

dependent and neglected in July 2018 and remained in the custody of the Tennessee Department of Children's Services ("DCS" or "the Department").[1]

The Department filed a petition to terminate Father's parental rights in December 2019 and alleged grounds of abandonment by wanton disregard, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for the child. The Department later nonsuited the persistence of conditions ground.

Father, who was 27 when the court heard this case in June 2020, has a significant history of criminal activity. According to the records admitted into evidence and Father's testimony at the hearing, he was incarcerated from April to August 2011 for robbery. He was arrested and held for a day in December 2012 for unlawful restraint and domestic violence. Father spent two weeks in jail in December 2012 and January 2013 for contempt of court. From February through July 2013, Father was incarcerated for resisting arrest, criminal mischief, tampering with the property of another, and contempt of court. From August through early October 2013, he was jailed on multiple charges; he pled guilty to felony domestic violence in September 2013. Father was again incarcerated for a week in January 2015 for obstructing official business and, in March 2015, he was held for failure to appear. In August 2015, Father spent time in jail for contempt of court regarding nonsupport of a dependent child. Then, in November 2015, he was jailed for disorderly conduct, resisting arrest, and criminal trespass. Father was jailed again in December 2015, and in May 2016, he pled guilty to possession of heroin, attempted possession of a weapon under a disability, and illegal conveyance of drugs into jail. Father was sentenced to five years and six months in prison; his sentence expires in March 2021.

Father became aware that he was Sylvia's father when she was about six months old. Father was 18 years old. Father asserts that, after he was released from jail at the end of July 2013, he was active in Sylvia's life, providing diapers, clothes, and food and visiting two or three times a week. However, Father was reincarcerated from mid-August through early October 2013 on a domestic violence incident where another of his children was present, as well as charges for obstructing official business. When Father was in jail, Sylvia was in the care of her maternal grandmother and uncle.

Father was not incarcerated during 2014. At the time of the hearing in June 2020, he had not seen Sylvia since around Thanksgiving or early December 2014, when she was three years old. Although he had some brief stints in jail during the first half of 2015, Father's current incarceration did not begin until December 2015. Yet, Father did not see Sylvia in the year between December 2014 and December 2015.

---

[1] Mother subsequently surrendered her parental rights to Sylvia.

During his current incarceration, Father began writing letters to Sylvia. On the advice of the child's therapist, who reported that Sylvia was fearful of Father because of things she had heard about him, DCS determined that the child would not receive Father's letters until the therapist concluded that she was ready. After learning that Sylvia was not receiving his letters, Father stopped writing to her. Jessica Dillon, the child's case manager beginning in December 2018, reported that Sylvia did not know who Father was. Sylvia's foster mother stated that Sylvia recalled seeing Father in court once when she was about five years old.

Father admits that he knew how to contact DCS within a few weeks of Sylvia's removal from Mother's custody. According to Ms. Dillon, he contacted DCS only three or four times in the eighteen months preceding the hearing to find out how the child was doing. The last time Father had seen a photo of Sylvia was about two and a half years before the hearing but, Ms. Dillon stated, he never requested a photo from DCS. Father did not know which school the child attended or what grade she was starting in the fall.

While incarcerated, Father has completed courses to improve his behavior and employment prospects, including barber school. He also completed mental health and psychosexual assessments and reported that he was given no recommendations for further treatment. Upon his anticipated release on March 24, 2021, Father planned to find employment through Damascus, a staffing company that connects those recently released from incarceration with temporary employment. Father expressed a desire to parent Sylvia and provide for her needs and estimated that it would take 60 to 90 days to find employment and get himself in a stable position to parent. If need be, and with the permission of his probation or parole officer, he was willing to relocate from Ohio to Tennessee.

After her removal from Mother, Sylvia was placed in a foster home, where she has lived for over two years. She has been receiving regular therapy, which has helped her progress. The foster mother described Sylvia as a happy, active child who is engaged in many activities and has many friends. The child told her foster parents that she wanted them to adopt her, and the foster parents wish to adopt Sylvia. Ms. Dillon believes that removal of Sylvia from the foster home and placing her with Father would be traumatic for the child, who has no relationship with Father.

At the conclusion of the termination hearing, the trial court found clear and convincing evidence of both grounds for termination and determined that termination of Father's parental rights was in the child's best interest. On appeal, Father challenges the trial court's termination on both grounds as well as the court's best interest determination.

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND
APPELLATE REVIEW

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51.

Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Terminating a parent's rights is one of the most serious decisions courts make. The termination of "parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1). Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Evidence that meets the clear and convincing evidence standard "'enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). Such evidence "establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d at 523-24 (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

ANALYSIS

I.      Abandonment by wanton disregard.

Father challenges the trial court's decision to terminate his parental rights based upon abandonment by wanton disregard. Tennessee Code Annotated section 36-1-113(g)(1) provides that a parent's rights may be terminated where the parent abandons the child, as defined in Tenn. Code Ann. § 36-1-102. Pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c), abandonment is defined to include a parent who is incarcerated when the termination petition is filed and who "[h]as engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."

The statute does not define "wanton disregard." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005). Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. The kinds of "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

The wanton disregard ground is not limited to the four months immediately preceding the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871. The statutory language states, however, that the actions must occur "prior to incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c); *see also In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *7 (Tenn. Ct. App. May 2, 2017). In this case, the crimes considered by the trial court in making its determination of wanton disregard did not include the robbery for which Father was incarcerated for approximately four months in 2011. The trial court found that Father was not aware of Sylvia's birth prior to the robbery offense. As this court has previously stated, "a person cannot disregard or display indifference about someone whom he does not know exists." *In re Anthony R.*, 2015 WL 3611244, at *3. Thus, the wanton disregard provisions "must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken." *Id.*; *see also In re Jeremiah N.*, 2017 WL 1655612, at *7.

In determining that Father's rights should be terminated on the ground of abandonment by wanton disregard, the trial court made the following findings:

> But [Father] is currently in prison for the offense that is identified in Tab Number 34, and that is possession of heroin, attempted possession of a weapon under disability, and illegal conveyance of drugs into the jail. The sentencing occurred on that, on May 13, 2016, but he was already serving a portion of that prison sentence. He'd already been in jail, for several months at the time that sentence was entered in Auglaize County, Ohio. That sentence was a 66 month sentence and apparently it [started] sometime around December of 2015 and the Court does not believe he has been out of jail since.

> At that point in time, the child would have been four years old, and [Father] admitted in his testimony that he clearly knew of her existence. In fact, shortly before entering jail for that sentence, he had indicated around Thanksgiving he had seen the child.[2] So, clearly the definition of wanton disregard would apply to that particular matter.

> . . . [K]nowing that he had a child, Sylvia, [Father] engaged in criminal activity. That is wanton disregard. That is indifference to the welfare of your child.

> This child needed the father to be there. Needed the father to provide income, food, shelter, and so forth. And yet, knowing that child needed those things, the father committed the crimes as outlined of possessing heroin,

---

[2] Father actually saw Sylvia around Thanksgiving 2014, at least a year before his December 2015 incarceration.

- 6 -

having the weapon, and taking drugs into the jail, which has resulted in the father serving this lengthy sentence. There were other crimes outlined in the Petition that the father had committed prior to that. They were much more minor than this and the Court believes that even [though] those particular orders were not in Exhibit 1, the father has admitted during his testimony to committing those crimes of disorderly conduct, contempt of court, obstructing of official business, resisting arrest and so forth.

So, there's been proof that has been introduced in this record of criminal activity resulting in a lengthy incarceration and leaving the child without her father.

The evidence does not preponderate against the trial court's factual findings.

Father argues that the trial court erred in concluding that these findings constituted abandonment by wanton disregard because "the behavior that resulted in incarceration is not part of a broader pattern of conduct that renders the parent unfit or pose a risk of substantial harm to the welfare of the child." He further emphasizes that his incarceration occurred when "he was barely over the age of eighteen" and asserts that he has now "grown up and exhibited a pattern of behavior of a parent who loves and wants to parent [his] child."

Although the wanton disregard provision does not make incarceration alone a ground for terminating parental rights, it "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. Courts consider incarceration a "triggering mechanism that allows them to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* We have explained that "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Although Father was eighteen at the time of some of the crimes and incarcerations mentioned above, he was 22 years old when the offenses for which he is currently incarcerated occurred. Moreover, he had already been incarcerated for lesser offenses, including a domestic violence incident at which one of his children was present, before he was sentenced to 66 months. (As mentioned above, the trial court did not consider Father's conviction of robbery when he was eighteen in its wanton disregard analysis because Father was not aware of Sylvia's existence at that time.) Father admitted to being incarcerated on at least six occasions predating his arrest on the charges that led to his current incarceration, and he was aware of Sylvia's existence when he incurred all of those charges. At the

hearing, he acknowledged his incarcerations in December 2012 (unlawful restraint and domestic assault), February through July 2013 (on charges of resisting arrest, criminal mischief, tampering with the property of another, and contempt of court), August through October 2013 (domestic violence), a few days in September and October 2013 for separate charges of obstructing official business, and November 2015 (disorderly conduct, resisting arrest, criminal trespass). Thus, Father's criminal history does not stem from one incident and demonstrates a "broader pattern of conduct that renders [him] unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

Father also argues that, prior to his current incarceration, he exhibited significant efforts to establish a meaningful relationship with Sylvia. He testified that he was active in Sylvia's life in 2013, visiting with her two or three times a week and providing diapers, clothing, and food. However, Father spent over five months in jail in 2013, so his parenting efforts were not consistent. Moreover, at the time of his current incarceration, Father had not seen Sylvia for a year. Thus, Father failed to work to maintain a relationship with her even when he was not incarcerated.

In arguing that the trial court erred in terminating his parental rights based upon abandonment by wanton disregard, Father relies on *In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541 (Tenn. Ct. App. Dec. 30, 2016). In particular, Father emphasizes that the court in *In re Renaldo M.* took into account the mother's efforts to establish a meaningful relationship with her children. *In re Renaldo M.*, 2017 WL 1041541, at *5. The mother in that case "completed tasks on the permanency plan, spent $800.00 on parenting classes, and attended every visitation with the children that she was permitted." *Id.* Father argues that he, too, "made an effort to be a fit parent prior to incarceration by visiting with Sylvia and paying for Sylvia's necessities while barely being above the age of eighteen." Unfortunately, Father's efforts in the present case are not comparable to those relied upon by the court in *In re Renaldo M.* As discussed above, the efforts cited by Father occurred in 2013, a year when he spent over five months in jail. Moreover, Father failed to see the child for approximately a year during a time when he was, for the most part, not incarcerated.

Father also points to his efforts to improve himself during his current incarceration, which are laudable. This ground for termination, however, is based on "conduct *prior to incarceration* that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). We examine Father's conduct "during the four months immediately preceding [his] incarceration or at some earlier point in time." *In re Audrey S.*, 182 S.W.3d at 871. Thus, his conduct during his current incarceration is not relevant to this ground for termination.

We find no error in the trial court's determination that there was clear and convincing evidence supporting the termination of Father's parental rights for abandonment by wanton disregard.

II.    Failure to manifest ability and willingness to assume custody.

Father argues that the trial court erred in determining that there was clear and convincing evidence to terminate his parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, the petitioning party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioning party must prove that "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights must prove that a parent failed to manifest either an ability or a willingness to assume custody or financial responsibility for the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13(Tenn. Ct. App. June 20, 2018)).[3] Proof of willingness requires "more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018); *see also In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019) (holding that the parents' desire to reunite with their children was insufficient to demonstrate a willingness or ability). A parent demonstrates willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Jonathan M.*, 2018 WL 5310750, at *5. In determining whether a parent has manifested an ability to parent the child, a court "focuses on the parent's lifestyle and circumstances." *Id.*

Father expresses a strong desire to assume responsibility for Sylvia by providing for her needs. His actions and circumstances, however, fail to demonstrate an ability or a willingness to assume custody of the child. The trial court made the following relevant findings:

> The child was born in 2011. From that time to 2015, there was some criminal activity, some time period of being out of jail. There was at least probably around one year that the father was not in jail. So there was a time frame that the father could have manifested an ability to take custody, straighten up his life and raise his child. It sounds like from the testimony today that he has a good child, a good smart, intelligent, and talented child that certainly anyone would want to be around and raise. But the father didn't.

---

[3] The Supreme Court's recent decision in *In re Neveah M.,* 614 S.W.3d at 675-77, resolved a split in authority on the Court of Appeals regarding the proper interpretation of the first prong of Tenn. Code Ann. § 36-1-113(g)(14). In his brief, submitted before the *In re Neveah M.* decision was entered, Father relies upon *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044 (Tenn. Ct. App. May 31, 2018), a case that was overruled by *In re Neveah M. See In re Neveah M.*, 614 S.W.3d at 677.

Then, the one that landed the father in this particular circumstance has cause[d] him to be out of the child's life now for approximately five years. So the father failed to manifest an ability and willingness to personally assume and take legal and physical custody of the child.

The evidence does not preponderate against the trial court's factual findings.

In asserting his willingness to care for Sylvia, Father focuses on his efforts in 2013 to provide the child with diapers and other supplies and to visit her several times a week. As previously discussed, however, Father was incarcerated for five months in 2013 and was, therefore, unable to care for the child during that time. Furthermore, even during the year preceding his current incarceration, most of which Father spent out of jail, he did not visit Sylvia. Thus, Father's claims of willingness are undercut by his inconsistent and inadequate efforts prior to his incarceration. Moreover, even if we were to find that Father is willing to parent Sylvia, he does not have the ability to do so. Father's release from prison is scheduled for March 24, 2021. As he acknowledged at the hearing, it will take several months (or more) for him to obtain employment and housing sufficient to enable him to care for Sylvia. Given Father's history prior to incarceration, we cannot know when or if he would actually be able to act as the child's parent because he has not manifested that ability.

The second prong examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). We have held that, to be "substantial," the harm must present "'a real hazard or danger.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). In addition, the harm must be "'sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *Id.* (quoting *Ray*, 83 S.W.3d at 732).

The trial court made the following findings relevant to the second prong:

Placing the child back into [Father's] custody would pose a substantial harm to the physical or psychological welfare of the child. Testimony has been that this child has now gone into a foster home where she is now in a stable environment. She is thriving. She is healthy. She is well fed. Her needs are being met. So someone has stepped into the father's place and manifested an ability to parent that the father has failed to do so when he had the opportunity.

The evidence does not preponderate against these findings. Father has been incarcerated for most of Sylvia's life as a result of his criminal behavior. Ms. Dillon testified that the

- 10 -

child does not know who Father is and does not ask about him. Removing Sylvia from her "current family and placing [her] with a near-stranger of a parent would cause the child emotional harm." *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019).

Clear and convincing evidence supports the trial court's determination that Father's rights be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(14).[4]

## III. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father's parental rights, we must next consider whether the trial court properly determined that termination of Father's parental rights was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.

After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent, and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When determining whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the non-exclusive factors set out in Tenn. Code

---

[4] The trial court made the following findings regarding Father's testimony:

> The Court has heard the testimony of the father that he has worked hard while in prison. It sounds like he has grown up and wants to be a parent. The Court believes the request to be given a chance is genuine. The Court does believe that in watching the father in the video and does appreciate that he has participated in this trial. . . . The Court would much rather the father be here, be part of the process and ask and request. It does show that the father cares. That is good.

Despite Father's credibility, the trial court concluded that, under the law, there was clear and convincing evidence that he failed to manifest an ability to parent the child.

Ann. § 36-1-113(i).  A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d at 682.

In this case, the trial court made the following findings regarding the statutory factors:

> (1) Whether or not the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent.

> That Ground must be found by clear and convincing evidence that it is not in the best interest of the child to be placed into the home of the father or into the custody of the father at this time.  That's the only time that the Court can consider making these decisions, not what might happen in the future.  But given where we are today, given the circumstance of the father, the conduct of the father, and the condition that the father is in, would it be safe to place the child in the father's custody?  The answer by clear and convincing evidence is no, it would not.  The father is in prison.  The child is in a safe and stable home and it just would not work. . . .

> (2) Whether or not the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such a duration of time that lasting adjustment does not reasonably appear possible.

> That Ground is not found and it is denied.

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child.

> Certainly, the father has not maintained visitation or contact with the child.  There has been testimony that the father has written letters, but was told that the letters could not be given to the child because of the therapist needing to determine when would be the best time for the child to review and see those letters.  Therefore, the father stopped writing those letters.  He's testified that he's requested telephone, video, and other types of contact which he has been denied.  But the other side of it from the child's perspective, there's not been a regular visitation or other contact with the child.  The Court's going to not make a finding on that particular matter and

- 12 -

deny that Ground because of the father's particular circumstance, and his efforts to write letters, and those were denied to be sent to the child. Who knows how that might have been different had the child been able to read those letters and so forth. So that Ground has not been met.

> (4) Whether a meaningful relationship has otherwise been established between the parent and the child.

That is clear and convincing it has not been. The testimony has been that the child doesn't ask about the father, doesn't request contact with you. It has been five years, she was four. The Court would imagine she has some remembrance of the father, but it would not be much. She would not have much remembrance of the father. She is now nine. So by clear and convincing evidence, there's not a meaningful relationship between the father and the child. . . .

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition.

That Ground is met by clear and convincing evidence. Clearly, the foster mother that testified has done a wonderful job caring for the child. At the time that the child came into her custody, she had been in a situation with the mother, at no fault of the father, but with the mother where she was accused of shoplifting. The child didn't have anything, other than the clothes on her back. Now, the Court will note one thing, it was the father's fault in that the father had gotten himself in prison and was not there to stop it. But, he was not there for the actual event. But the foster mother was available after it occurred, to take care of the child, raise her, and give her a good life. She is doing well in school. She is doing well with the Boys and Girls Club, swimming, growing up, just being a child. . . . The foster parents should be well commended for taking care of the child. So, it would be emotionally, psychologically draining and harmful for that child to change caretakers. . . .

> (6) Number (6) [concerning physical, sexual, emotional or psychological abuse, or neglect] does not apply.

> (7) Whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent consistently unable to care for the child in a safe and stable manner;

- 13 -

Certainly, since the Petition has been filed the father has not had a home. The father has been in prison. The proof is clear that the time period before you entered this prison sentence that your conduct and criminal activity would not have made it safe for this child to be there. There was criminal activities such that it was not healthy and safe for the child to be there. The father has landed in prison as a result of drugs, possession of heroin, and even attempted to convey drugs into the jail. So that Ground is met by clear and convincing evidence because the physical environment of the parent would not be healthy or safe. The father doesn't have a home for the child to go to. . . .

> (8) Whether the parent's mental and/or emotional status would be detrimental to the child or prevent the parent from effectively providing safe and stable care and supervision for the child.

. . . There has not been any proof that the father's mental or emotional status would be detrimental to the child. To the contrary, the Court does believe that the father loves the child and does not want his rights to be terminated. So that Ground is not met.

> (9) [Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.]

[T]here's not an order of child support that the Court can find or that the Court has been made aware of so that Ground does not apply.[5]

In arguing that the trial court erred in concluding that termination of his rights was in the best interest of the child, Father focuses on his youth at the time of his offenses, his efforts during incarceration to better himself, his impending release from prison, and his plans upon his release. The trial court recognized Father's love for Sylvia and his intentions to improve his life. As stated above, however, once the trial court determines that there is clear and convincing evidence of at least one ground for termination, the court's focus

---

[5] In Tennessee, "parents are presumed to know they have a legal obligation to support their children." *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *18 (Tenn. Ct. App. June 17, 2015) (citing Tenn. Code Ann. § 36-102(1)(H)). This court has "declined to conclude that [a parent's] failure to support was excused by the absence of a court order requiring them to do so." *In re Sydney B.*, 537 S.W.3d 452, 459 (Tenn. Ct. App. 2017) (citing *In re Makenzie L.*, 2015 WL 3793788, at *20).

We note that, in his testimony, Father acknowledged that he had been ordered by a court in Ohio to pay $50 a month in child support for Sylvia. He understood that approximately four dollars a month was being deducted from his income while in prison to pay child support for Sylvia.

shifts to the perspective of the child, not that of the parent. *In re Audrey S.*, 182 S.W.3d at 877.

The evidence does not preponderate against the trial court's factual findings, and the court properly determined that there was clear and convincing evidence that termination was in the best interest of the child.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Jamarcus D., and execution may issue if necessary.


_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE